**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | | |
|---|---|---|
| VERNONA D. ASLIM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| *v.* | ) | |
| | ) | No. 1:17-cv-371 (AJT/IDD) |
| RYAN D. MCCARTHY, Acting Secretary, | ) | |
| U.S. Department of Army, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## **INTRODUCTION**

Plaintiff Vernona Aslim brings this Title VII discrimination suit alleging that she was not selected for a high-ranking civilian position at the Department of Army due to the fact that she is a Muslim woman.  For the reasons below, the Court should grant summary judgment on this claim to the Defendant Ryan D. McCarthy, Acting Secretary of the Army ("the Secretary").

In Fall 2013, Plaintiff, then an employee at the Pentagon, applied for a newly created position within the Office of the Assistant Chief of Staff for Installation Management ("ACSIM"), which is within the Department of Army and oversees a wide variety of infrastructure issues on military installations.  The job was accorded the rank of GS-15, the highest grade on the GS scale.  The position's description and list of duties—which were approved by the Army's Human Resources division before being publically posted—stated that the person selected would have two primary duties: (1) the person would serve in a high-level leadership role as Deputy Chief of Army Housing; and (2) the person would also supervise "CP-27," which is the career field designation for Army civilians who work in positions related to housing on military installations.

Plaintiff was selected for an interview with a five-member panel that had been compiled by one of her strongest supporters, Ms. Suzanne Harrison, who was then Chief of Army Housing.  Plaintiff concedes that none of those panel members *ever*—either before, during, or after the interview—made any remarks to her about gender or religion.  She concedes that the panelists treated the interview seriously and took copious notes while scoring Plaintiff quantitatively using detailed rubrics.  She also concedes that she was asked the exact same questions as the other candidates.  After each panelist independently scored the applicants'

resumes and interviews using detailed rubrics, Plaintiff received the second-highest total, scoring one point less than another applicant, Ms. Judith Hudson.

However, the selecting official Ms. Carla Coulson, who was Ms. Harrison's second-level supervisor, decided that even though Plaintiff had been outscored, it would be unfair to make a final hiring decision when the top two scores had been so close.  Accordingly, Ms. Coulson arranged for Plaintiff and Ms. Hudson to undergo another round of interviews conducted by Ms. Coulson herself and by Col. Leo Pullar, who was another Chief within ACSIM.  Plaintiff again concedes that, during this second interview, she was asked the same questions as Ms. Hudson, that the panelists treated the interview seriously, and that she has never—at any time—heard any derogatory remarks about gender or religion from either panel member.  Ms. Coulson ultimately chose to select Ms. Hudson for the position because of Ms. Hudson's extensive leadership experience at two of the largest military bases in the country.

The Fourth Circuit has repeatedly stated that "[w]e do not sit as a 'super-personnel department weighing the prudence of employment decisions' made by the defendants." *Anderson v. Westinghouse Savannah River Co.,* 406 F.3d 248, 272 (4th Cir. 2005).  Accordingly, Plaintiff may not "substitute [her] business judgment for that of the employer" in terms of what qualifications were desirable for a certain position.  *Miller v. Locke*, No. 1:08-CV-1149, 2009 WL 1675486, at *5 (E.D. Va. June 12, 2009) (Trenga, J.).  Thus, to carry her burden under *McDonnell-Douglas*, the Fourth Circuit has held that Plaintiff must make "a strong showing that [her] qualifications are demonstrably superior" to Ms. Hudson's, *as measured by the qualifications* sought by the acknowledged selecting official, Ms. Coulson.  *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 261 (4th Cir. 2006).  Plaintiff cannot meet this burden.

Plaintiff concedes that Ms. Coulson steadfastly viewed the newly created position as requiring someone with a strong background of leadership experiences. Ms. Hudson—the ultimate selectee—had already been a GS-15 for years and had served as Deputy of Public Works and Deputy Garrison Commander at two of the largest installations in the country, meaning she had thousands of employees under her, managed budgets in the hundreds of millions of dollars, and all housing managers (including those in CP-27) were in her chain of command. By comparison, Plaintiff was a GS-14, had never held such a high-level position and had at most ten people under her at the Pentagon. Plaintiff cannot show that she was demonstrably more qualified than Ms. Hudson on the critical aspect of prior leadership experience.

Nor is there any other evidence of pretext here. Ms. Coulson's explanation for hiring Ms. Hudson has never changed: Ms. Hudson had a wealth of high-level positions, including over housing managers, that Plaintiff simply did not have. Also, the selection process was painstakingly equitable, open, structured, and involved multi-member panels with multiple levels of review. If anything, Plaintiff was treated more favorably during the process than Ms. Hudson: Plaintiff was given a second-round interview even though she had been outscored by Ms. Hudson in the first round.

For these reasons, and as explained below, Plaintiff cannot carry her burden under *McDonnell-Douglas*, and accordingly the Court should grant summary judgment to the Secretary.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**I.      CREATION OF THE GS-1173-15 POSITION AND ITS DUTIES.**

1.      In June 2013, the Army announced funding for 86 new high-ranking GS-15 positions across various civilian components of the Army.  DEX11; DEX9, ¶ 3.  The logistics of filling these positions would be administered by the Army's Human Resources Division, known as G-1.  DEX1, ¶ 6; DEX9, ¶¶ 3-4; DEX24 at 39:11-12.[1]

2.      One of these new positions was assigned to the Pentagon and allocated to "CP-27," or "Career Program 27," which is the career field designation for Army civilians who work in positions related to managing housing on military installations for the Assistant Chief of Staff for Installation Management ("ACSIM").  DEX1, ¶ 3; DEX9, ¶ 3.

3.      Ms. Diane Randon, Deputy Assistant Chief of Staff, Installation Management, DEX8, ¶ 2; Ms. Carla Coulson, Director of Installation Services, DEX1, ¶ 1; and Col. David Hall, Deputy Director of Installation Services, DEX2, ¶ 3—who were the high-ranking supervisors within ACSIM—consulted in August 2013 and agreed to use this new position to solve several personnel gaps in the Housing Division within ACSIM.  They proposed rolling the duties of the Deputy Chief of Housing into the newly created CP-27 position and having a single individual in charge of both tasks.  DEX1, ¶ 5.  There were several reasons for this:

a.      First, the CP-27 duties by themselves would not amount to a full-time position, especially not for a rank as high as GS-15, which is the highest grade on the scale.  DEX1, ¶ 4; DEX8, ¶ 3; DEX10 at 128-39.  CP-27 is a "very small" Career Program, and even today the tasks of CP-27 at the Pentagon are performed on a part-time basis.  DEX1, ¶ 4.

---

[1] For exhibits comprised of transcript experts (DEX10, DEX24, DEX25), the page cite given refers to the pagination shown on the original transcript.

b.      Second, the Chief of Housing (Suzanne Harrison) had a Deputy Chief position beneath her, but it had been vacant for an extended period of time because of hiring freezes. DEX1, ¶ 4; DEX10 at 194.  For several reasons, Ms. Harrison badly needed a Deputy.  The quality and timeliness of the work that Ms. Coulson was receiving from the Housing Division "was often inadequate."  DEX1, ¶ 9(a); DEX10 at 132.  Due to medical issues, Ms. Harrison also had "frequent absences," and "when she was not present, there was a significant void in leadership."  DEX1, ¶ 9(a); DEX2, ¶ 6; DEX3; DEX10 at 128-29, 132.  A Deputy with leadership experience would be able to fill in for Ms. Harrison during her frequent absences. Further, most of Ms. Harrison's time in the office "was consumed directing the day-to-day actions and responding to regular fast turnaround actions, such that she had little time to think critically or strategically."  DEX1, ¶ 9(a).  A Deputy with leadership experience could free Ms. Harrison for other tasks.  DEX1, ¶ 9(a).

c.      Third, the position description template that Army Headquarters had created for the new GS-15 positions included an optional "supervisory" set of duties that was twenty lines long and stated, among other things, that the selectee would "[p]erform[] the full range of supervisory duties for a staff of GS-12 through GS-14 employees."  DEX14 at 4.  Further, the template for the job announcement itself, which was likewise created by Army Headquarters, repeatedly used words like "oversee," "direct," "supervise," "lead," and "manage," which indicated to Ms. Coulson that "the selectee would not necessarily be performing technical aspects but rather would need to be able to lead and oversee others who did have technical expertise."  DEX1, ¶ 9(b); DEX10 at 131.

4.      Before the decision was formally made, Ms. Coulson sought and received approval from Army G-1 to combine the Deputy duties and the CP-27 duties into this newly

created position.  DEX1, ¶ 6; DEX10 at 192.  G-1 confirmed that combining these duties was in accordance with G-1's intent for the position.  DEX1, ¶ 6; DEX10 at 192; DEX24 at 42:19-21.

     5.     At the time the duties were combined, Plaintiff had not told Ms. Coulson, Ms. Randon, nor Col. Hall that Plaintiff intended to apply for the position.  DEX24 at 43:8-9 (Coulson), 44:2-7 (Hall), 45:24-46:1 (Randon).

     6.     Ms. Coulson stated that because the new position was a high-ranking GS-15 job, Ms. Coulson herself would be the hiring official—*i.e.*, Ms. Coulson would make the ultimate decision on who would be hired into the position.  DEX9, ¶ 4.  Because of the critical importance of finding a Deputy for Ms. Harrison, Ms. Coulson communicated to Ms. Harrison from the very beginning that the person ultimately selected for this new position would need to have "abundant leadership skills."  DEX1, ¶ 9; DEX10 at 128.

     7.     Ms. Harrison revised the template position description and job announcement to reflect the multiple duties.  DEX1, ¶¶ 7-8.  Ms. Harrison sent the position description and job announcement to the Army Civilian Personnel Advisory Center ("CPAC"), DEX1, ¶ 8; DEX9, ¶ 7, which is independent from ACSIM, DEX24 at 35:18-19.  CPAC approved the position description and posted the announcement online for the period of September 11, 2013, through September 27, 2013.  DEX1, ¶ 8; DEX12; DEX13 (job announcement); DEX14 (position description).  The position description and job announcement were never changed *after* they were publically posted.  DEX24 at 37:14-17.

## II.    FIRST ROUND INTERVIEWS.

     8.     After the posting closed, CPAC forwarded the names of three individuals who had applied and were deemed by CPAC to be qualified.  DEX15; DEX9, ¶ 7.  Anyone forwarded by CPAC is "considered to have met the requirements of the position description" and also of the

"job announcement" itself.  DEX24 at 36:9-17; *see also* DEX1, ¶ 11; DEX10 at 173.  The three candidates were (a) Plaintiff, (b) Ms. Judith Hudson, and (c) Ms. Zeli King.  DEX15.

9.      Ms. Coulson had known Plaintiff for well over a decade, DEX1, ¶ 2; DEX24 at 88:19-22, and for the entirety of that time, knew that Plaintiff was a Muslim woman, DEX1, ¶ 2, as Plaintiff had worn a hijab for more than twenty years, DEX24 at 130:19-20.  During this time, Plaintiff and Ms. Coulson had "always worked very well together," DEX1, ¶ 2; DEX10 at 175, and, in Plaintiff's words, Ms. Coulson was "always respectful," DEX24 at 89:8.  Ms. Coulson had even granted Plaintiff discretionary bonuses in the past.  DEX24 at 151:21-23.

10.      Ms. Coulson delegated the initial selection process to Ms. Harrison, the Chief of Housing.  DEX9, ¶ 4.  Ms. Harrison was one of Plaintiff's strongest supporters, and Plaintiff has stated that Ms. Harrison is "very fair and honest."  DEX24 at 54:10.  Ms. Harrison had even allowed Plaintiff to perform her daily prayers in Ms. Harrison's office when Plaintiff was unable to perform her prayers at home.  DEX24 at 18:14-16.

11.      All three of the referred candidates would be interviewed for the position.  DEX9, ¶ 7.  With Ms. Coulson's sign-off, Ms. Harrison selected five panelists for the interviews, with the goal of having diversity in terms of interaction with Housing, positions held, civilian/military, gender, and ethnicity.  DEX9, ¶ 5.  The panelists were: Ms. Harrison herself, Col. Hall, Sandy Ian Clark (Deputy Division Chief), Paul Cramer (Deputy Assistant Secretary), and Jackie Anthony (Supervisory Management Analyst).  DEX9, ¶ 5; DEX1, ¶ 14.

12.      Around October 10, 2013, Ms. Harrison sent to each member of the panel an interview packet, which consisted of the candidates' resumes, detailed rubrics for scoring the candidates' resumes and upcoming interviews, the job announcement, the position description, and interview instructions.  DEX16; DEX2, ¶ 8; DEX18.

13.     Before the interviews, each panelist independently scored the three candidates'
resumes using the detailed rubric created by Ms. Harrison, where education, technical
experience, and job experience were ranked on a scale of 1 to 5.  DEX17; DEX9, ¶ 6.

14.     With limited input from Ms. Coulson, Ms. Harrison had also developed the list of
questions for the panelists to ask each candidate during the interview.  DEX1, ¶ 13; DEX9, ¶ 8;
DEX16 at 22-25.  Each panelist would independently score each candidate's response on each
question, using a scale of "expert," advanced," "intermediate," "basic," or "having an
awareness."  DEX9, ¶ 8; DEX16 at 22-25.

15.     Before each interview, the panel members rehearsed the questions to ensure that
no one deviated from the questions that Ms. Harrison had prepared.  DEX2, ¶ 12; DEX3.

16.     Each of the interviews occurred on October 18, 2013.  DEX9, ¶ 9.  Plaintiff was
asked the exact same questions as the other candidates, DEX24 at 61:8-9, and the panelists took
the interview seriously, DEX24 at 64:19-22.  The panelists all took copious notes during the
interviews.  These notes then allowed each panelist independently to quantitatively score the
applicants on numerous categories and questions.  DEX16 at 39-69.

17.     After the interviews, Ms. Harrison added up the total resume and interview points
awarded by the panelists to each of the three candidates.  Ms. Hudson had scored the highest,
with Plaintiff one point behind, and Ms. King in a distant third.  DEX9, ¶ 10; DEX16 at 35-37.
Plaintiff herself has acknowledged that Ms. Hudson "scored very well."  DEX24 at 69:2-3.

18.     Two panelists (Col. Hall and Mr. Cramer) voted to recommend that Ms. Hudson
should be selected.  DEX2, ¶ 18; DEX16 at 49, 57.  Two panelists (Ms. Harrison and Mr. Clark)
voted to recommend that Plaintiff should be selected.  DEX16 at 43, 69.  The fifth panelist, Ms.
Anthony, could not decide between Plaintiff and Ms. Hudson.  DEX16 at 62.  Even though he

ultimately voted in favor of Plaintiff, Mr. Clark stated that he had tied Plaintiff and Ms. Hudson

in scoring, and he indicated that "Ms. Hudson was a strong candidate."  DEX25 at 17.  Ms.

Anthony likewise stated the two candidates were "neck and neck" and "I truly believe that either

one of them could do this job, absolutely."  DEX25 at 56.

## III.  SECOND-ROUND INTERVIEWS.

19.     Because the panel deadlocked and failed to make a recommendation, DEX2, ¶ 22,

Ms. Anthony suggested to Ms. Coulson that there be a second round of interviews of Plaintiff

and Ms. Hudson. Ms. Coulson "thought this was a great idea."  DEX1, ¶ 16; DEX10 at 135.

20.     Ms. Coulson personally conducted the second interviews of both Plaintiff and Ms.

Hudson.  DEX1, ¶ 17.  Ms. Coulson asked the new Division Chief of the Environmental

Division, Col. Leo Pullar (who was not a part of the first round of interviews), to participate in

these second interviews to provide a fresh set of eyes to the position and selection.  DEX1, ¶ 17;

DEX4, ¶ 7; DEX5; DEX6.

21.     The second round of interviews occurred on November 7, 2013 (Ms. Hudson) and

November 12, 2013 (Plaintiff).  DEX1, ¶ 18.  Again, the panelists treated both candidates exactly

the same; indeed, Plaintiff was asked the same questions as Ms. Hudson.  DEX24 at 95:7-9;

DEX19.  Also, Ms. Coulson insisted that both interviews be conducted telephonically to ensure

that neither candidate was treated differently.  DEX1, ¶ 17; DEX4, ¶ 8; DEX5; DEX6.

## IV.  MS. COULSON SELECTS MS. HUDSON.

22.     As stated above, Ms. Coulson was the selecting official, and the hiring decision

was Ms. Coulson's alone to make.  DEX24 at 102:14-16; *see also* DEX1, ¶ 20; DEX4, ¶ 12.

23.     After finishing Plaintiff's interview on November 12, 2013, Ms. Coulson and Col.

Pullar discussed the candidates and agreed that while Plaintiff had more experience on the

technical CP-27 side of the position, Ms. Hudson had a tremendous breadth of leadership experience, including time as a Deputy Garrison Commander and also as a Director of Public Works, meaning she had overseen literally thousands of employees, including those dedicated to housing and CP-27, at bases like Ft. Bragg and Ft. Campbell, which are two of the largest military housing installations in the country.  DEX1, ¶¶ 22, 23; DEX4, ¶ 12; DEX16 at 12-16; DEX20.

24.     By comparison, Plaintiff had supervised, at most, ten people at the Pentagon. DEX24 at 16:17-20.  She had never held a high-ranking position like Deputy Garrison Commander or Director of Public Works.  DEX16 at 6-11.  And while Ms. Hudson had been a GS-15 for years, DEX16 at 12-16, Plaintiff was still a GS-14, DEX16 at 6-11.

25.     And as stated above, from the beginning, Ms. Coulson had articulated that the position needed someone with a demonstrated background of high-level leadership.  DEX1, ¶ 9. Accordingly, Ms. Coulson chose Ms. Hudson for the position.  DEX20.  Ms. Coulson did not consult Col. Hall or Ms. Randon on this decision.  DEX1, ¶¶ 12, 30; DEX2, ¶ 25; DEX8, ¶ 7.

26.     Ms. Coulson immediately prepared a detailed memorandum for record, dated November 14, 2013, explaining her decision.  DEX20; DEX1, ¶ 22; DEX10 at 192-94.  The memorandum gave the same rationale as Ms. Coulson had given to Col. Pullar two days earlier: the Deputy position required someone "with a diverse background who has led large and complex organizations and sought out jobs of ever-increasing difficulty and responsibility." DEX20; DEX1, ¶ 22.  Ms. Coulson explained that Ms. Hudson met "all of those criteria" because she had "led change across a wide range of transformational opportunities" while a Deputy Garrison Commander and had "significant experience at Army installations as a Director of Public Works," meaning that "she will be able to understand how CP-27 career management,

10

as well as her leadership within the Army Housing Directorate, directly impacts quality of life for Soldiers and Families."  DEX20; DEX1, ¶ 22; DEX10 at 192-94.  Ms. Coulson also noted that Ms. Hudson had received a Master's degree from the Army War College during nights and weekends, which "points to her desire to self-improve" and "strengthen her leadership skills." DEX20; DEX1, ¶ 22.  By comparison, Plaintiff did not have a Master's degree.  DEX24 at 8:6.

## V.    POST-SELECTION.

27.    Because of Ms. Coulson's respect for Plaintiff, Ms. Coulson voluntarily met with Plaintiff several days later to explain why she had not been chosen for the position.  DEX1, ¶ 25; DEX10 at 138-47.  Plaintiff's notes from the meeting confirm that Ms. Coulson gave the same rationale to Plaintiff verbally as provided in her memorandum: namely, that the position was "Deputy focused," that Ms. Hudson "had held positions as the [Deputy of Public Works] and the Deputy Garrison Commander and supervised large and complex organizations," which was experience that the Housing division sorely needed but which Plaintiff could not match. DEX21; DEX24 at 105:3-6, 106:8-15, 107:9-14, 107:21-23; DEX1, ¶ 25; DEX10 at 138-47.

28.    Ms. Coulson offered to meet again with Plaintiff, who returned several days later to continue to discuss the non-selection.  DEX1, ¶ 26; DEX24 at 103:22-24.  Ms. Coulson reiterated her rationale from the first meeting.  DEX1, ¶ 26; DEX10 at 138-47.

29.    Plaintiff suffered no reduction in grade, scale, or salary after her non-selection, nor did she face any discipline.  DEX24 at 132:10-24.  Plaintiff acknowledges that her job was not more arduous afterward, and in fact she had "less on [her] plate."  DEX24 at 133:4-18.

30.    After Ms. Hudson began her job as Deputy and CP-27 manager, she met with Plaintiff and Ms. Harrison to discuss division of duties.  DEX9, ¶ 12.  Plaintiff's own memorandum for record from this meeting states that she "suggest[ed]" that Ms. Hudson should

do "all" of the CP-27 duties—in fact, it would be "wrong" for Plaintiff to continue to do any such duties because, in her mind, Ms. Hudson had been hired to do that job.  DEX22.  Plaintiff said, "You guys hired" Ms. Hudson, so "have her do it," and Plaintiff handed all of her CP-27 duties to Ms. Hudson.  DEX24 at 127:11-12; *see also* DEX9, ¶ 12.

31.    Ms. Hudson "was one of [the] highest performers during her time at ACSIM, including on the CP-27 duties of her position," and she remained in the Deputy position for 18 months before accepting "a more prestigious position as a Division Chief."  DEX1, ¶ 29.

32.    Plaintiff never—at any point—personally heard any disparaging remarks suggesting any kind of bias again women, Muslims, or Muslim women from *any of the seven individuals who interviewed her*: Ms. Coulson, Col. Pullar, Col. Hall, Ms. Harrison, Mr. Cramer, Ms. Anthony, or Mr. Clark.  DEX24 at 65:9-17 (Col. Hall, Ms. Harrison, Mr. Cramer, Ms. Anthony, Mr. Clark); DEX24 at 91:3-5; DEX24 at 89:9-11 (Ms. Coulson); DEX24 at 97:20-23 (Ms. Coulson and Col. Pullar).  Plaintiff likewise acknowledges that she has never heard any such remarks from Ms. Randon, the highest-ranking of the supervisors who had agreed to combine the CP-27 and Deputy duties.  DEX24 at 122:8-10.

## VI.    PROCEDURAL HISTORY.

33.    On March 30, 2017, Plaintiff filed suit in this Court alleging discrimination based on the combination of religion and gender.  Dkt. 1.  Plaintiff also appeared to bring hostile work environment and constructive discharge claims, but on July 7, 2017, the Court dismissed those claims as unexhausted.  Dkt. 19.  The Court ruled that "[t]he case will proceed as to Plaintiff's failure to promote claim."  Dkt. 19 at 1.

# ARGUMENT

## I.     LEGAL STANDARDS FOR A NON-SELECTION CLAIM.

Plaintiff claims that she was not selected for the Deputy position because of the combination of her religion and gender.[2]  In a non-selection case, in order to survive summary judgment, Plaintiff must first establish a *prima facie* case of unlawful discrimination.  *See Bush v. Hagel*, No. 1:12-CV-01483, 2014 WL 345650, at *2-3 (E.D. Va. Jan. 30, 2014) (Trenga, J.) (setting out test); *see also Chapman v. Geithner*, No. 1:11-CV-1016, 2012 WL 1533514, at *15 (E.D. Va. Apr. 30, 2012) (noting that test is the same for non-selection as for failure-to-promote); *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133, 142 (2000).  In order to establish a *prima facie* case of discriminatory non-selection, a plaintiff must either (1) produce "direct evidence" of discrimination, *Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.,* 53 F.3d 55, 58 (4th Cir. 1995), or (2) satisfy the burden shifting rubric established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

Where there is no direct evidence in a non-selection case, *McDonnell-Douglas* requires that the plaintiff must prove the following in order to show a *prima facie* case: she "(1) is a member of a protected group; (2) applied for the position in question; (3) was qualified for the position; and (4) was rejected for the position in favor of someone not a member of the protected

---

[2] Plaintiff's argument is that she was not selected because she is a Muslim female, but that she probably would have been selected if she had been a Muslim male or a non-Muslim female. DEX24 at 130:4-131:4.  Accordingly, Plaintiff is bringing a "hybrid claim" consisting of the intersection of two different protected classes, neither of which could stand on its own in this particular case because Plaintiff concedes that a Muslim could have been hired, and she concedes that a woman could have been (and indeed was) hired.  The Fourth Circuit "has not decided whether such 'hybrid' claims may be maintained" under Title VII.  *Guessous v. Fairview Prop. Investments, LLC,* 828 F.3d 208, 226 n.9 (4th Cir. 2016) (citing decisions disagreeing on the issue).  For purposes of this motion for summary judgment, the Secretary assumes *arguendo* that such a claim is viable under Title VII, as Plaintiff's claims fail anyway for the reasons discussed in this memorandum.

group under circumstances giving rise to an inference of unlawful discrimination." *Bush*, 2014 WL 345650, at *2 (alterations omitted).

If the plaintiff establishes a *prima facie* case, then a burden of production—but not the burden of proof or persuasion—shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Burdine,* 450 U.S. at 253.  If the defendant meets its burden of production, "plaintiff must then prove, by a preponderance of the evidence, that the defendant's articulated reasons are a pretext for discrimination." *Bush*, 2014 WL 345650, at *2.  In a non-selection case, the plaintiff bears her burden of demonstrating pretext by making "a strong showing that [her] qualifications are demonstrably superior" to the selectee's.  *Heiko v. Colombo Sav. Bank, F.S.B.*, 434 F.3d 249, 261 (4th Cir. 2006).  Critically, in that analysis, "it is the employer's perception of performance or qualifications that counts, not the plaintiff's or the plaintiff's co-workers."  *Radeline v. Gruenberg*, No. 1:15-CV-957, 2016 WL 1271037, at *2 (E.D. Va. Mar. 28, 2016).

## II.   PLAINTIFF CAN SHOW NEITHER DIRECT EVIDENCE NOR PRETEXT FOR HER NON-SELECTION FOR THE DEPUTY POSITION.

As discussed next, there is no direct evidence of discrimination in this case, and therefore Plaintiff must base her "opposition to summary judgment on the *McDonnell Douglas* burden shifting scheme."  *Bush*, 2014 WL 345650, at *2; *see* Part II.B, *infra*.

### A.   There Is No Direct Evidence Of Discriminatory Animus.

Plaintiff's Complaint does not allege any direct evidence of discrimination in this case, but to the extent Plaintiff may attempt to show direct evidence by citing to a third-hand rumor

about a remark allegedly made by Col. Hall, Plaintiff cannot rely on such hearsay by a non-decision-maker to establish direct evidence or to avoid summary judgment.[3]

### 1.   The Col. Hall Rumor Is Multiple-Level Inadmissible Hearsay That Cannot Be Considered On Summary Judgment.

"Generally speaking, only competent admissible evidence is eligible for consideration on summary judgment." *In re Paysage Bords De Seine, 1879 Unsigned Oil Painting on Linen by Pierre-Auguste Renoir*, 991 F. Supp. 2d 740, 745 (E.D. Va. 2014) (Brinkema, J.)  (citing *Greensboro Professional Fire Fighters Ass'n v. City of Greensboro*, 64 F.3d 962, 967 & n. 5 (4th Cir. 1995)).  Rule 56 itself expressly states that a "party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2).

Plaintiff claims in a memorandum to herself that, at some unknown point, Col. Hall allegedly said that Plaintiff would not be taken seriously as a leader because she is a Muslim woman.  Plaintiff concedes that she never heard this remark herself, and she has actually *never* heard any derogatory remarks from Col. Hall (nor any of the other people involved in any way in shaping or filling the Deputy position).  DEX24 at 65:9-17, 89:9-11, 91:3-5, 97:20-23, 122:8-10. In fact, the Col. Hall rumor is based on hearsay and rumor of the worst kind: akin to the classic game of "telephone," Plaintiff says that Ms. Harrison said that Ms. Marianne Eisenhauer-Wall said that Col. Hall said that Muslim women are ineffective as leaders.  Ms. Eisenhauer-Wall is a former ACSIM employee who had retired in June 2013.

"Multiple hearsay, where the declarant is steps removed from the original speaker, is particularly problematic." *Anim v. Mukasey*, 535 F.3d 243, 257 (4th Cir. 2008).  But what makes

---

[3] Although the Secretary contends that any argument by Plaintiff on this point lacks merit, the Secretary addresses it here because of Plaintiff's *pro se* status and in the interests of good faith.

this rumor truly remarkable is that even the person who allegedly heard it—Ms. Eisenhauer-Wall—has consistently and emphatically denied ever hearing any such comments from Col. Hall.  DEX7; DEX23.  She has stated under oath that she is "appalled at such an allegation" because she "never said any such thing about Colonel Hall, nor did Colonel Hall ever make any such remarks to me or in my presence."  DEX7, ¶ 4; DEX23.  Ms. Eisenhauer-Wall was uninvolved in the selection process and never discussed it—or Plaintiff's qualifications—with Col. Hall.  DEX7, ¶ 1, 4, 8.  Col. Hall himself has emphatically denied making any such remark at any time.  DEX2, ¶ 27; DEX3.

In other words, there is not a single person who claims that he or she actually overheard Col. Hall ever make any comments of this nature.  Accordingly, the only way that Plaintiff could seek to introduce this alleged statement would be through Ms. Harrison or through Plaintiff herself.  But this would amount to either double- or triple-level hearsay.  Where testimony includes multiple levels of hearsay, *each* of the "levels must either be excluded from the definition of hearsay or satisfy some exception to the hearsay rule" before the testimony can be admitted.  *United States v. Portsmouth Paving Corp.*, 694 F.2d 312, 321 (4th Cir. 1982).  There is no hearsay exception that could apply to the alleged conversation between Ms. Eisenhauer-Wall and Ms. Harrison, let alone for the subsequent conversation between Ms. Harrison and Plaintiff.

This same situation arose in *Bragg v. Orthopaedic Assocs. of Virginia, Ltd.*, No. CIV A 206CV347, 2007 WL 702786, at *6 n.4 (E.D. Va. Mar. 2, 2007), where Judge Friedman held that a plaintiff cannot rely on refuted, multi-level hearsay to establish direct evidence of discrimination or to avoid summary judgment.  "To the extent that the plaintiff relies upon the allegations that Summerlin used a racial epithet when referring to the plaintiff, such evidence is

at least second-level hearsay.  Summerlin denies making such remarks, and Karen Honey, from whom the plaintiff claims she first heard of the alleged remarks, *has denied that she heard them or discussed any racial insult with the plaintiff at all*." *Id.* (emphasis added).  *Bragg* held that such rumors are not to be considered on summary judgment and are not direct evidence of discrimination, and therefore the plaintiff's case must be analyzed under *McDonnell-Douglas*. *Id.; see also, e.g., Johnson v. Weld Cnty.*, 594 F.3d 1202, 1208 (10th Cir. 2010) (Title VII case refusing to find direct evidence based on an alleged derogatory remark that was "bundled inside [three other individuals'] out-of-court remarks to [a fourth individual] which are themselves hearsay").

Because Plaintiff will be unable to offer any *admissible* form of this alleged Col. Hall remark, it cannot be considered during summary judgment and therefore does not provide any direct evidence.  *See Md. Highways,* 933 F.2d at 1251; Fed. R. Civ. P. 56(c)(2).

### 2.   Col. Hall Was Not The Decision-Maker Nor Principally Responsible For Hiring Ms. Hudson.

In any event, Col. Hall was not the decision-maker here, nor was he principally responsible for choosing Ms. Hudson, and therefore, regardless of whether he ever made such a comment, it cannot be attributed to the Secretary in this case.  The *en banc* Fourth Circuit has held that, in a Title VII case, the plaintiff must show discriminatory animus either by the "actual decisionmaker" or by a subordinate employee who "possessed such authority as to be viewed as the one principally responsible for the [hiring] decision." *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 291 (4th Cir. 2004).  Where an employee does not meet this definition, his actions do not bind the employer, *even if* he "had a substantial influence on the ultimate decision or … played a role, even a significant one, in the adverse employment decision." *Id.*

Col. Hall was merely one of five panelists during the *initial* interview, which deadlocked and failed to make any decision regarding who should be hired for the Deputy Position; indeed, once Ms. Coulson decided to move to a second round of interviews in part *to provide Plaintiff with a second chance*, Col. Hall was uninvolved (and thus irrelevant to the decision-making process).  DEX2, ¶¶ 22, 25.  He clearly was not the ultimate decision-maker—a point that Plaintiff has conceded.  DEX24 at 102:14-16.  Further, Ms. Coulson and Col. Hall have both stated that they did not discuss whether Plaintiff or Ms. Hudson should be chosen.  DEX1, ¶ 30; DEX2, ¶ 25.  Thus, Col. Hall also was not the person "principally responsible for the decision" to hire Ms. Hudson.  *Hall*, 354 F.3d at 291.  In fact, he had no influence on the final decision to hire Ms. Hudson.  DEX2, ¶ 25.[4]

Accordingly, even assuming the rumored Col. Hall statement actually occurred (which it did not, even in this summary judgment context), the statement still does not impute to the Army and cannot create direct evidence nor a triable issue.

### B.    Plaintiff Cannot Meet Her Burdens Under *McDonnell-Douglas*.

Because there is no direct evidence of unlawful animus here, Plaintiff must proceed under the burden-shifting analysis prescribed by *McDonnell-Douglas*.  As explained next, she cannot satisfy her burdens, and therefore the Court should grant summary judgment to the Secretary.

---

[4] Further, because of the rumor's nebulous nature, it is not clear when it even allegedly occurred, and thus there is no evidence that ties it to the particular employment decision at hand.  A remark by a non-decision-maker months or years before a position is filled cannot create direct evidence. *See Warch v. Ohio Cas. Ins. Co.*, 435 F3d 510, 520 (4th Cir. 2006) (defining "direct evidence" to be "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision").

1.      **Plaintiff's *Prima Facie* Case.**

The Secretary acknowledges, for purposes of summary judgment, that Plaintiff can show

a *prima facie* case.[5]

2.      **Ms. Coulson Certainly Had A Legitimate, Non-Discriminatory
Reason For Choosing Ms. Hudson Over Plaintiff.**

The burden of production—although not of proof or persuasion—then shifts to the

Secretary to "articulate some legitimate, nondiscriminatory reason for the employee's rejection."

*Burdine,* 450 U.S. at 253.  The selecting official, Ms. Coulson, stated that she chose Ms. Hudson

over Plaintiff because Ms. Hudson had significantly more and broader leadership experience

than Plaintiff did; thus, in Ms. Coulson's view, Ms. Hudson was the better candidate for the

particular skills that Ms. Coulson believed the position to require.  DEX1, ¶¶ 22-23; DEX20;

DEX21.  There is no doubt that this is a legitimate, non-discriminatory reason.  *See, e.g., Evans*

*v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996) ("[R]elative employee

qualifications are widely recognized as valid, non-discriminatory bases for any adverse

employment decision.").

Thus, the burden shifts to Plaintiff to prove, by a preponderance of the evidence, that the

defendant's articulated reasons "are a pretext for discrimination."  *Bush*, 2014 WL 345650, at *2.

As discussed next, Plaintiff cannot meet this burden.

3.      **The Proffered Reasons Are Not A Mere Pretext.**

The issue in this case "reduces, then, to whether [Plaintiff] has come forward with

evidence sufficient for a fact finder to conclude that defendant's explanation is not the real

---

[5] However, the Secretary notes that there is no record evidence to indicate or even suggest what
religion (if any) the selectee Ms. Hudson practices, which is significant because a *prima facie*
case requires Plaintiff to demonstrate *inter alia*, that she "was rejected for the position in favor of
someone not a member of the protected group."  *Bush*, 2014 WL 345650, at *2 (alterations
omitted).

reason for [Hudson's] selection, but rather a pretext for … discrimination against [Plaintiff]." *Bush*, 2014 WL 345650, at *2.

Given that Title VII does not allow this Court to sit as a "super-personnel department," the Fourth Circuit has mandated that plaintiffs must bear a significant burden in non-selection cases. To establish pretext in a non-selection case, Plaintiff must make "a strong showing that [her] qualifications are *demonstrably superior*" to the selectee's (*i.e.*, Ms. Hudson). *Heiko*, 434 F.3d at 261 (emphasis added). Critically, when analyzing whether Plaintiff has met this burden, "[i]t is the perception of the decision maker which is relevant,' not the self-assessment of the plaintiff." *Evans*, 80 F.3d at 960-61. "Defendant's explanation of its hiring decision is entitled to substantial weight and deference." *Bush*, 2014 WL 345650, at *3. "In Plaintiff's attempts to show pretext, [she] may not recast an employer's legitimate, non-discriminatory reason or substitute [her] business judgment for that of the employer" *Miller v. Locke*, No. 1:08-CV-1149, 2009 WL 1675486, at *5 (E.D. Va. June 12, 2009) (Trenga, J.).

### a.   Plaintiff Cannot Establish She Was Substantially More Qualified On The Concededly Crucial Element Of Leadership.

Plaintiff has conceded that Ms. Coulson was the selecting official, DEX24 at 102:14-16, and has also conceded that Ms. Coulson "believe[d] that leadership was important for this position," DEX24 at 102:17-21. Plaintiff also acknowledges that Ms. Coulson's stated rationale for the hiring decision was that Ms. Hudson "had stronger leadership." DEX24 at 107:17. Accordingly, Plaintiff must demonstrate that she was substantially more qualified than Ms. Hudson, especially in the critical area of leadership experience. *See Bush*, 2014 WL 345650, at *3 (the "decision is also supported by a comparison of the candidates' respective qualifications"); *Dennis,* 290 F.3d at 656 (when measuring qualifications, "it is the perception of the decision maker which is relevant"). Plaintiff cannot meet this burden.

Ms. Hudson possessed "management experience that plaintiff did not, including experience in high level positions." *Bush*, 2014 WL 345650, at *3. Ms. Hudson had been employed by the Army in various positions dealing with installations management for over twenty years. DEX16 at 12-14. She had previously been a Deputy Garrison Commander at Ft. Bragg, where she managed a budget of over $400 million and had personal experience dealing with efforts to privatize Army housing. DEX1, ¶ 23; DEX16 at 12-14. Ms. Hudson also had "significant experience at Army installations as a Director of Public Works" at Ft. Campbell, DEX20, where she managed a budget of $150 million, led an organization of six divisions of 245 to 400 people apiece, and all CP-27 employees would have been in her chain of command, DEX1, ¶ 23; DEX16 at 12-14. Thus, Ms. Hudson had worked at two of the largest Army housing operations in the entire country, and she had overseen thousands of employees, including those dedicated to housing and CP-27. DEX1, ¶¶ 22, 23; DEX16 at 12-16; DEX20. As Ms. Coulson concluded, Ms. Hudson's varied and high-level Army positions meant that "she [would] be able to understand how CP-27 career management, as well as her leadership within the Army Housing Directorate, directly impacts quality of life for Soldiers and Families." DEX20; DEX1, ¶ 22.

By comparison, Plaintiff supervised, at most, ten people at the Pentagon, DEX24 at 16:17-20, and had no high-level experience working on domestic Army bases, let alone at two of the largest Army housing operations in the country, DEX16 at 6-9. And whereas Ms. Hudson had been a GS-15 for years, DEX16 at 12-16, Plaintiff was still a GS-14, DEX16 at 6-11.

Further, Ms. Hudson had received a Master's degree from the Army War College through a distance learning program (*i.e.*, during nights and weekends). DEX1, ¶ 22; DEX20. This gave her a superior education to Plaintiff, who does not possess a Master's degree. DEX24 at 8:6; *see*

*Bush*, 2014 WL 345650, at *3 (comparing plaintiff's and selectee's degrees).  Further, achieving a Master's degree while working full-time also "point[ed] to [Ms. Hudson's] desire to self-improve" and "strengthen her leadership skills."  DEX20; DEX1, ¶ 22.

Given this disparity in credentials, Plaintiff cannot demonstrate that she was more qualified than Ms. Hudson, especially in the critical area of leadership—let alone that Plaintiff's credentials were "demonstrably superior" to Ms. Hudson's.  *Heiko*, 434 F.3d at 261.

Ms. Coulson was hardly alone in viewing Ms. Hudson as the more qualified choice.  Out of the seven different people who had interviewed both Plaintiff and Ms. Hudson, only two had voted to hire Plaintiff (Ms. Harrison and Mr. Clark).  DEX16 at 43, 69.  And one of those panelists—Mr. Clark—had actually tied the two candidates in scoring, and later said that "Ms. Hudson was a strong candidate."  DEX25 at 17.  And Ms. Anthony, the one panel member on the first interview who could not choose between Plaintiff and Ms. Hudson, said Plaintiff and Ms. Hudson "were neck and neck," and that "either one of them could do this job, absolutely." DEX25 at 56.

Plaintiff undoubtedly considers herself to have been more qualified, but it "is the employer's perception of performance or qualifications that counts, not the plaintiff's or the plaintiff's co-workers."  *Radeline*, 2016 WL 1271037, at *2; *see also Johnson v. Runyon*, 151 F.3d 1029 (4th Cir. 1998) (table) ("[I]n discrimination cases, a subjective belief of discrimination, however genuine, cannot be the basis of judicial relief." (quotation marks and alteration omitted)).

Under the qualifications that the parties agree Ms. Coulson used, Plaintiff cannot show that she was more qualified than Ms. Hudson, let alone *substantially* more qualified.

**b.    The Hiring Process Was Open, Structured, Meticulously Equitable, And Involved Multiple Levels Of Review.**

"Moreover, there is no evidence of the type typically present in 'pretext' cases that would justify submission to a jury on that issue." *Bush*, 2014 WL 345650, at *3. Most critically, the selection of Ms. Hudson "was the result of an open, structured process involving multiple levels of review and evaluation," which speaks strongly against any claim of pretext. *Id.*

1. Initially, adding the Deputy role to the new GS-1173-15 position was entirely appropriate—it occurred through a multi-layered review and approval process, and before anyone applied to the position. Indeed, this decision was made by a group of several high-ranking ACSIM supervisors, DEX1, ¶ 5, and Ms. Coulson received express approval from Army G-1 (Human Resources) before adding the Deputy portion, DEX1, ¶ 6; DEX10 at 192. Plaintiff acknowledges that G-1's approval means that it was a "valid position description and job announcement." DEX24 at 42:19-21. Further, pretext is less likely where the hiring official "consistently consulted with HR" about the process. *Watson v. Shenandoah Univ.*, No. 5:14CV22, 2016 WL 8619550, at *13 (W.D. Va. Nov. 14, 2016), *adopted*, 2017 WL 1181029 (W.D. Va. Mar. 29, 2017).

The decision to add the Deputy duties to the position came before the position was posted publically and before anybody applied; indeed, the decision was made before Plaintiff had even told Ms. Coulson, Ms. Randon, or Col. Hall that Plaintiff *intended* to apply. DEX24 at 43:8-9, 44:2-7, 45:24-46:1. Plaintiff also concedes that the position description was never changed *after* it was publically posted. DEX24 at 37:14-17.

And importantly, Ms. Harrison—who was one of Plaintiff's strongest supporters and whom Plaintiff refers to as "very fair and honest," DEX24 at 54:10—was the person who initially revised the position description and job announcement to include the Deputy's duties.

23

DEX1, ¶¶ 7-8.  CPAC, which Plaintiff acknowledges is independent from ACSIM, DEX24 at 38:18-19, likewise reviewed and approved the job announcement and position description before posting it online, DEX1, ¶ 8; DEX12.  CPAC was also the entity that screened the applications, DEX15; DEX9, ¶ 7, and Plaintiff concedes that any application forwarded by CPAC (*i.e.*, including Ms. Hudson's) is "considered to have met the requirements of the position description," DEX24 at 36:9-17.

2.  The actual review process was much the same.  As for the first-round interviews, it was again Plaintiff's friend and supporter Ms. Harrison who assembled the list of questions and panelists, with oversight from Ms. Coulson.  DEX9, ¶¶ 5, 8; DEX1, ¶¶ 13-14; DEX16 at 22-25. The panelists used a detailed points rubric to independently score each applicant's resume on multiple aspects before the interviews.  DEX17; DEX18; DEX9, ¶ 6.  The interview panelists represented a diverse group in terms of job positions, background, and ethnicity and gender. DEX9, ¶ 5.  The panelists rehearsed the questions beforehand to ensure there would be no deviation.  DEX2, ¶ 12; DEX3.  Plaintiff concedes that she was asked the exact same questions during the interview as the other candidates.  DEX24 at 61:8-9.  The panelists all took copious notes, again independently scoring each applicant on multiple questions, using a five-point scale. DEX16 at 39-69.  Plaintiff concedes the panelists all took the interview seriously.  DEX24 at 64:19-22.  As the Fourth Circuit has noted, preparing such a detailed interview process directly undercuts a claim of pretext.  *See, e.g., Obi v. Anne Arundel Cty., Md.*, 28 F. App'x 333, 335 (4th Cir. 2002) (affirming summary judgment in Title VII case where the defendant "relied on rank-ordering of candidates by a review panel, based on objective reviews of documentation and subjective interviews during which all candidates were presented with the same questions and rated on their answers").

24

Further, even though Plaintiff was outscored by Ms. Hudson on the total resume and interview points, Ms. Coulson *still* decided to have a second round of interviews with Plaintiff and Ms. Hudson.  DEX1, ¶ 16.  Again, Plaintiff concedes she was asked the exact same questions during this interview as Ms. Hudson was.  DEX24 at 95:7-9.  To ensure that neither candidate had even the slightest advantage, Ms. Coulson insisted that the second interview be done telephonically for both candidates.  DEX1, ¶ 17.

After selecting Ms. Hudson, Ms. Coulson drafted a detailed memorandum for record explaining her actions, DEX20, and she even met repeatedly with Plaintiff to explain why she had not been selected, DEX1, ¶¶ 25-26; DEX10 at 138-47; DEX21; DEX24 at 103:22-24, 105:3-6, 106:8-15, 107:9-14, 107:21-23.

If anything, Plaintiff was treated more favorably during the selection process than Ms. Hudson, who had outscored Plaintiff in the first round but nonetheless was asked to come back and go through another interview in order to give Plaintiff another chance.  Plaintiff has never explained why Ms. Coulson would have gone through all the work of a second interview if the process was a "sham" designed to ensure Plaintiff did not receive the position.

From beginning to end, the process followed by the Army here was designed to ensure a fair and impartial decision-making.  Both Plaintiff and Ms. Hudson were treated equally at every step of a meticulous selection process that involved over a dozen people from inside Housing, outside Housing, and in Army's HR and resume-screening groups.  The extreme attention to detail and equitable procedure during the hiring process confirms that there was no pretext and that Plaintiff was taken seriously as a candidate the entire time.  *See Obi*, 28 F. App'x at 335.

### c.     The Selecting Official's Explanation Has Not Changed.

Further, there is no evidence that Ms. Coulson's explanation changed over time or across individuals as to why Ms. Hudson was chosen over Plaintiff.  *See, e.g., E.E.O.C. v. Sears Roebuck & Co.*, 243 F.3d 846, 852–53 (4th Cir. 2001).

Ms. Coulson told Ms. Harrison from the very beginning—well before the position was ever publically posted—that the selectee would need to have "abundant leadership skills." DEX1, ¶ 9; DEX10 at 128.  The work product that Ms. Coulson had been receiving from Housing was untimely and lower quality than she expected, DEX1, ¶ 9, and she attributed this to Ms. Harrison's frequent absences (often due to medical issues), which meant that there was a chronic lack of leadership in Housing, DEX1, ¶ 9; DEX2, ¶ 6; DEX3; DEX10 at 128-29, 132.  A Deputy with leadership experience would be able to step in immediately and assume Ms. Harrison's responsibilities when she was out of the office.

After the second-round interviews, Ms. Coulson drafted her detailed memorandum for record, in which she explained that she was selecting Ms. Hudson due to her significant background in high-level leadership positions at some of the largest Army housing installations in the country.  DEX20; DEX1, ¶ 22.  Plaintiff's own hand-written notes from her meetings with Ms. Coulson immediately after Plaintiff was not selected confirm that Ms. Coulson told Plaintiff repeatedly that Ms. Hudson had been hired because she "had stronger leadership," DEX24 at 107:17, and "had held positions as the [Director of Public Works] and Deputy Garrison Commander and supervised large and complex organizations."  DEX24 at 106:13-15.  Those are the same reasons Ms. Coulson testified to at the EEO fact-finding, DEX10 at 192-94, and they are the same reasons she has offered to this Court in her declaration, DEX1, ¶¶ 22-23.

Clearly, from Day One, *even before Plaintiff applied for the position*, the decision-maker Ms. Coulson viewed broad leadership experience as an extremely important qualification, and that is precisely why Ms. Coulson chose Ms. Hudson.  Those explanations have never changed. At bottom, Plaintiff simply disagrees with management's decision to make this position a Deputy in the first place.  But, as the Fourth Circuit has held, a plaintiff "cannot establish her own criteria for judging her qualifications" for a position to which she has applied.  *Anderson v. Westinghouse Savannah River Co.*, 406 F.3d 248, 269 (4th Cir. 2005).

### d.   The Selecting Official Has Previously Granted Plaintiff Discretionary Benefits.

Plaintiff cannot demonstrate pretext for the additional reason that Plaintiff acknowledges that Ms. Coulson had known Plaintiff for over a dozen years, during which time Plaintiff had always worn a hijab, and that Ms. Coulson was always respectful and had approved discretionary year-end bonuses for Plaintiff.  DEX24 at 151:21-23; DEX1, ¶ 2; DEX10 at 166, 175.

Plaintiff never explains why, after a dozen years of being respectful and fair to Plaintiff, Ms. Coulson would suddenly gone out of her way to devise an elaborate hiring scheme to prevent Plaintiff from obtaining the Deputy job due to her status as a Muslim woman.  Indeed, caselaw indicates that discrimination is "especially unlikely" where the same decision-maker refuses to promote or select a plaintiff to whom the decision-maker had previously given benefits in full knowledge of the plaintiff's protected status.  *Amirmokri v. Baltimore Gas & Elec. Co.*, 60 F.3d 1126, 1130 (4th Cir. 1995); *see also Evans*, 80 F.3d at 959; *Hines v. Hillside Children's Ctr.*, 73 F. Supp. 2d 308, 316 (W.D.N.Y. 1999) ("Plaintiff has presented no evidence to show why Diesenberg would have suddenly decided out of the blue to begin discriminating against Hines in 1991 [after giving positive reviews in prior years]. Had he been so inclined, he could have given plaintiff poor reviews in prior years as well.").

Ms. Coulson's respect for Plaintiff was further evidenced by Ms. Coulson's decision to meet repeatedly with Plaintiff after the non-selection to explain the rationale.  Plaintiff concedes that Ms. Coulson took both of those meetings seriously, DEX24 at 107:21-23; 109:21-23, and Ms. Coulson states that they even hugged after one of the meetings, DEX1, ¶ 25.  These are not the actions of a selecting official who harbored ill motive towards Plaintiff or who contrived an elaborate scheme to prevent Plaintiff from obtaining the Deputy position.

For all of these reasons, Plaintiff cannot demonstrate pretext, and accordingly summary judgment should be entered in favor of the Secretary.

* * *

Plaintiff should be proud of her long career of government service, and she was "no doubt highly qualified for the position, as reflected in [her] overall ranking, but the record would not support any inference that [Plaintiff] was overall necessarily more qualified than [Hudson]," *Bush*, 2014 WL 345650, at *3, let alone "demonstrably superior" to Ms. Hudson, *Heiko*, 434 F.3d at 261.  "More important, however, is that there is no evidence to support a finding that plaintiff was better qualified in the eyes of [Coulson], the selecting official."  *Bush*, 2014 WL 345650, at *3.

The process was highly structured and rigorously fair, from the initial resume screening process to the first-round interviews to the finalist interviews.  Ms. Coulson's hiring decision "is entitled to substantial weight and deference."  *Bush*, 2014 WL 345650, at *3.  Plaintiff cannot meet her burdens under *McDonnell-Douglas* of showing that the explanations for hiring Ms. Hudson were merely pretext for discrimination, and, accordingly, summary judgment should be entered in favor of the Secretary on Plaintiff's non-selection claim.

### III.     SUMMARY JUDGMENT IS ALSO APPROPRIATE ON PLAINTIFF'S RESTRUCTURING CLAIM, TO THE EXTENT IT REMAINS IN THE CASE.

The Court previously ruled that Plaintiff's case would move forward only on her non-selection claim. Dkt. 19 at 1. Accordingly, the Secretary contends that there are no additional claims remaining in this case. However, in an abundance of caution, and to the extent that the Court's prior ruling did not cover Plaintiff's claim that she suffered an adverse action when her CP-27 duties were transferred to Ms. Hudson, the Secretary offers the following arguments in support of summary judgment on that claim, as well.

Plaintiff alleges that, because of her religion and gender, her pre-existing position was "restructured," and she lost "all responsibilities for the housing career program" after Ms. Hudson was hired. Dkt. 1 at 10. Because Plaintiff appears to allege that her non-selection for the Deputy position caused her to remain in a position whose duties were shifted to the position for which she was not hired, this "restructuring" claim is merely derivative of her non-selection claim, and accordingly summary judgment should be granted to the Secretary for the same reasons it should be granted on the non-selection claim, discussed above.

Even if this restructuring claim were viewed separately from the non-selection, it would still be appropriate to enter summary judgment in favor of the Secretary. First, numerous courts have recognized that "changes in assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or work hour changes." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997) (collecting cases). It is undisputed here that "Plaintiff did not suffer a demotion, pay decrease, or performance-based discipline." *Kelly v. Boeing Co.*, No. 1:16-CV-00196, 2016 WL 7217661, at *3 (E.D. Va. Dec. 12, 2016); *see* DEX24 at 132:10-24. Mere "dissatisfaction with her job duties … does not rise to the level of an adverse action." *Kelly*, 2016 WL 7217661, at *3. While it is true that the

29

reassignment of job duties can sometimes constitute a materially adverse action, that is usually limited to circumstances where the new duties have a "significant detrimental effect" or are "significantly more stressful" on the employee, *Boone v. Goldin*, 178 F.3d 253, 256 (4th Cir. 1999), but Plaintiff concedes her duties here were actually *less* arduous after her non-selection, DEX24 at 133:4-18.

Second, even if the shift in duties were an adverse action, Plaintiff cannot demonstrate any discriminatory animus (and thus that the rationale behind this shift in duties was a mere pretext for discrimination) because Plaintiff admits that she was the person who insisted on shifting her CP-27 duties to Ms. Hudson.  According to a memorandum for record prepared by Plaintiff herself: after Ms. Hudson started, Ms. Harrison, Ms. Hudson, and Plaintiff had a meeting about the division of labor between Ms. Hudson and Plaintiff, and Plaintiff stated that Ms. Hudson should do "all" of the CP-27 duties—in fact, Plaintiff said it would be "wrong" for Plaintiff to continue to do any such duties.  DEX22.  Plaintiff said during her sworn deposition testimony, "You guys hired" Ms. Hudson, so "have her do it," and Plaintiff handed off all of her CP-27 duties to Ms. Hudson.  DEX24 at 127:11-12.  The Fourth Circuit has held that where a plaintiff "volunteered for the adverse action, the action was not motivated by [illegal] animus on the part of [the defendant], and summary judgment [is] proper."  *Hooper v. State of Md., Dep't of Human Res.*, 45 F.3d 426 (4th Cir. 1995) (table).

For these reasons, to the extent the restructuring-of-duties claim still remains in this case, summary judgment should be entered in favor of the Secretary on that claim, as well.

## **CONCLUSION**

For the reasons above, the Court should grant the Secretary's motion for summary judgment on any and all claims in this case.

Date: November 8, 2017                    Respectfully submitted,

                                          DANA J. BOENTE
                                          UNITED STATES ATTORNEY


                                          _____/s/_____
                                          R. TRENT MCCOTTER
                                          Assistant United States Attorney
                                          Office of the United States Attorney
                                          Justin W. Williams U.S. Attorney's Building
                                          2100 Jamieson Avenue
                                          Alexandria, Virginia 22314
                                          Tel:    (703) 299-3845
                                          Fax:    (703) 299-3983
                                          Email: trent.mccotter@usdoj.gov
                                          *Counsel for Defendant*


                                          31

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system and mailed a copy via U.S. Postal Service to:

Vernona D. Aslim
3961 Stirrup Court
Woodbridge, VA 22192
Email: aslimfamily1@gmail.com
Plaintiff Pro Se

_____/s/_____
R. TRENT MCCOTTER
Assistant United States Attorney
Office of the United States Attorney
Justin W. Williams U.S. Attorney's Building
2100 Jamieson Avenue
Alexandria, Virginia 22314
Tel:    (703) 299-3845
Fax:    (703) 299-3983
Email:  trent.mccotter@usdoj.gov
*Counsel for Defendant*